Good morning, ladies and gentlemen. This is the time for the hearing on bank. In the case of Abebe v. Gonzales, we understand that counsel are present, and each side has a total of a lot of time of 30 minutes. Counsel for the petitioners may proceed. May it please the Court. My name is Philip Hornick. I will focus six minutes on C. Simon Gister's fear of persecution due to his political activity and opinion. Karen Musala, my co-counsel, will spend 18 minutes focusing on issues related to petitioners' fear of and opposition to genital cutting of their daughter. We reserve eight minutes for rebuttal. This Court should reverse the immigration judge's decision because his finding that Mr. Mangistu does not have a well-founded fear of persecution is not based on substantial evidence. Based on the evidence of record, no reasonable fact-finder could fail to conclude that C. Simon Gister has a well-founded fear of persecution. This record included Mr. Mangistu's credible, consistent, and corroborated testimony. The immigration judge failed to consider the evidence as a whole, and he is required to do so by this Court's decisions in Geng v. Gonzalez, Kaiser v. Ashcroft, and Cardenas v. INS. The immigration judge selectively relied on portions of the State Department reports for his claim that the Ethiopian government only targets those who actively oppose the government and won't renounce violence. He cited the 1994 State Department Profile of Asylum Claim Statement that the Ethiopian government announced explicit guarantees of human rights and the Ethiopian government's statement that those willing to forswear violence may function freely. But the same report notes increasing intolerance of political dissent, as well as targeting of opposition parties, the independent press, and members of the Ethiopian Human Rights Council. The 1996 State Department Country Report noted that serious human rights problems remained and mentioned reports that political detainees were beaten or mistreated. The immigration judge ignored the 1994 INS Profile on Ethiopian Asylum Claims statement that the government keeps its opponents off balance by arresting some, ignoring others, holding some until they renounce violence, and holding some even though they have renounced violence. This report also includes an expert opinion that it is impossible to predict who the government will imprison. And the immigration judge disregarded reports by nongovernmental organizations, such as Amnesty International and the UN Commission on Human Rights, which state that the government has persecuted many of its nonviolent opponents. The evidence of Mr. Mengistu's political activity and beliefs is extensive. He is Amharic and believes in a multi-ethnic democratic system for Ethiopia. After he came to Portland, he joined Yehadar Afkari and Mabi, and as well the Ethiopian Cultural Organization, both of which oppose the Ethiopian government. Since 1993, he's been an active member of Medin. Medin was formed in the early 1990s. It is a multi-ethnic anti-government organization which has been banned from operating in Ethiopia. Some of its members have been persecuted by the government. Some of its members had ties with the Derg regime, including its founder, who is a high-ranking Derg military officer. Mr. Mengistu has helped recruit members from Medin and has attended meetings as well as a Medin conference in Washington. Breyer. Counsel, what do we do with the IJ's fact finding that all of these activities occurred after the proceedings were commenced against him to begin deportation, and the immigration judge concluded that essentially he was engaging in these activities in order to bolster his claim of ---- Counsel, may I give you a reprieve on answering that for just one moment? I neglected to announce that Judge Fletcher is unable to be with us today because of an unplanned need to be out of the country, but he is with us by phone, which is why there's an empty chair. Judge Fletcher, are you there? I am here, and I am listening. Thank you, Chief Judge Fletcher. Thank you. Thank you. Now you may proceed to answer the question. Yes. Well, first, I don't believe that the judge made a finding. He speculated on that, and I feel that was essentially speculation and no more. I think if we look at Mr. Mangustu's activities in context, including the fact that as early as high school he was politically active, indeed was in prison for political activity, I don't think we can just make an inference based solely on timing that there's an opportunistic motive for his joining this organization. Well, is it true as a matter of fact that he did not engage in the activities in the United States that he's seeking to rely on until after deportation proceedings were commenced against him? Well, the joining of Medin and the community organizations in Ethiopia, that's correct, but I would note that he did come to the United States on a scholarship provided by the Derg regime, which is now a deposed brutal military dictatorship. His family, including father, stepmother, sister, and cousin, who were identified with the Derg and were persecuted because of it, experienced events, some of which occurred before he came here. So there are factors occurring before his arrival and after. Was the – did he begin these activities before, after the proceedings were begun or after he applied for asylum? Did he apply for asylum before proceedings were begun or after proceedings were begun? He applied before proceedings were begun. Excuse me? He affirmatively applied. That is correct. And as I noted, he came in 1990 on a scholarship provided by the former government. His wife had difficulty in obtaining a passport and was questioned by the government and was asked about how he obtained a scholarship and what he was doing in the United States. His parents were members of the Workers' Party of Ethiopia, which was the – But that doesn't seem awfully odd, does it? I mean, if they're trying to find out why she wants to come, they want to know what he's doing here and so on. But that would also show that they have some concern about why he's here and whether he's a person of interest to them because they believe political activity or beliefs that are against their own interests. What's deceptive about that? I mean, he was here on a visa that called for him to go back. It was – they gave him a scholarship intending him to go back. They weren't planning him to get a scholarship and then stay in the United States. It would be pointless for them to do that. So why don't they have a legitimate interest in what their reason for being here is? Well, I would point out that he came on the scholarship of the previous government. The difficulties his wife experienced and the questioning she experienced occurred under the current government. But that doesn't explain why they wouldn't have a legitimate interest. I mean, you have to establish that no reasonable fact finder could reach a different result. And you're telling us why. Well, maybe the fact that they're interested has some bad connotations, but it may be perfectly legitimate as well. But that is but one fact that would need to be looked in context with all the others. And we believe if that is done, that the Court would be compelled to find that Mr. Mengistu has a well-founded fear of persecution. I've exhausted the time I've requested. And if there are no further questions, I will yield the floor to Ms. Musallo. Thank you very much. Thank you. May it please the Court. My name is Karen Musallo, and I apologize in advance that I woke up with a very bad chest cold this morning but decided to soldier on. And I hope that all of you will, that the raspiness in my voice will not detract from the content of my argument. And I really deeply apologize for this. Do you have water there? I do. Thank you so much. I do. I would like to address myself. I am going to address the genital cutting claim, and I'm going to make three arguments. The first one is that on this record, no reasonable fact finder could fail to find that there is a well-founded fear of female genital cutting of the petitioner's daughter or ostracism for refusal. Second, that under well-established principles of asylum law and the precedent of this Court, the petitioners are statutorily eligible for asylum because of the well-founded fear that their daughter will be subjected to female genital cutting or ostracized for refusal. And third, pursuant to the Supreme Court's decision in INSV Ventura and the circuit, this Court may decide on the issue of the petitioner's statutory eligibility and remand only for the exercise of discretion. First, I'd like to address that on this record, no reasonable fact finder could  petitioner's daughter or ostracized for refusal. Professor Masalas, could you address the exhaustion problem? I could only find one single-line reference in the facts section of Petitioner's case that has been mentioned, and there is no reference in the BIA's decision to the issue. Why shouldn't we dismiss for lack of jurisdiction on a failure to exhaust administrative remedy? Your Honor, thank you for that question. The female genital cutting issue was actually raised in front of the immigration judge. There were testimony as well as exhibits that were submitted. The immigration judge understood it was a part of the claim and directly addressed it in his opinion. And when the BIA affirmed the decision of the immigration judge, the BIA engaged in what we refer to as a Burbano Affirmance, which is to affirm the decision in its entirety, including the IJ's ruling on the female genital cutting. I'm sorry. Was it raised in the petition to the BIA? Was the issue raised? The issue was raised in the brief that was submitted to the BIA. Yes, Your Honor. Where? Where? Can you give us a page citation? I could only find the one reference. I don't see it raised as a specific legal issue. Your Honor, if I may address you to the appellate brief to the BIA. Yes. It's on page 23, where the 23 of what? 23 of the administrative records. Forgive me, Your Honor. Is this where we have the Bates numbers now? The Bates numbers that are stamped on the board. The administrative record, page 23, which is the petitioner's brief to the BIA, where the language states, and I can read you the language, this is from the brief itself. Further, the respondents submitted written testimonial evidence regarding their fear that their daughter, Amen Mengistu, would be subjected to female genital mutilation if respondents are forced to return to Ethiopia. And that's the only reference I could find in the brief. Is there any argument? That seems to me to be a factual recitation of what happened at the hearing before the immigration judge. Is it your position that that is sufficient to clearly and distinctly argue the issue to the board so that it knows that that is an issue that it is addressing? Well, Your Honor, two answers to that. One would be that the board could have chosen not to engage in a Burbano Affirmance and to rule on the political opinion aspect of the claim and say that the female genital cutting issue could not have been exhausted. I don't think the answer is responsive to my question, Professor. The question is, is that sufficient? Is that all a petitioner has to do in order to meet our case law that says he has to exhaust his administrative remedies before we have jurisdiction to review the claim? Yes. I would say, Your Honor, that under the case law of this circuit, that this Court has never found an issue to not exhaust or let me put it in the Congress, that the case law in this circuit where exhaustion is not found is where the petitioner raises for the very first time the issue they're asking the 9th Circuit. The point, Your Honor, is the point that the agency decided the question and it doesn't really matter whether it was properly raised in the first place. We have some case law that says that once they've decided it, then whatever problems there may have been with regard to exhaustion are going to sort of disappear because the question is whether they had a chance to address it and they did address it. And they did that by a Bourbonno affirmance. Yes, Your Honor, that's correct. Assuming you're correct on the Bourbonno affirmance, what the I.J. did was to make fact findings which are arguably unsupported by the record or arguably are supported. But all he did was to make a fact finding with respect to, in fact, the likelihood of the parent's ability to control what would happen to the daughter. So that's the extent of the BIA's affirmance. The I.J. did not reach, because in his view he did not have to reach, whether the fear was on account of membership in a particular social group, nor, of course, did the I.J. consider whether asylum application can be derivative of a U.S. citizen child. So why shouldn't those issues at least be ventured or remanded? Your Honor, the issue that the judge decided, that the fear was not well-founded, is a factual issue. And if this Court were to decide that no reasonable fact finder could find that there's not a reasonable possibility of that harm occurring, then once this Court decides that, the remaking issues in this case are clearly controlled by Ninth Circuit precedent. It's not the question of whether the parent can make a claim derivative of a U.S. citizen child's fear. That has never been addressed. And, indeed, to the contrary, we have explicitly done a ventura remand under an identical situation having to do with a CAT claim. Your Honor, if I may respond to that, that the issues on eligibility that would remain, if you find a well-founded fear of the female genital cutting, then the issue is, is that female genital cutting persecution? Is it on account of one of the five grounds? And can the parents of a child be included within a social group, which is defined by the harm? And I would say, Your Honor, that in a way it leads us astray to focus on the terminology of derivative, because these are actually not derivative claims. What we're talking about, this has been explored by the BIA. This is just all post-hearing argument. And you may be quite correct, but it's never been vented by the agency with the expertise and experience to deal with a very complicated issue of immigration policy. Well, Your Honor, when the court decided, the Ninth Circuit decided Chuck Rova, it established some precedent about considering whether... Absolutely, but not with respect to a U.S. citizen child. There, the disabled child was Russian. Yes, Your Honor, but the principles remain the same, because in the Chuck Rova case, that young disabled Russian boy in his own right and had the right to remain within the United States. So aren't there also possible differences between the relationship of the parents to the ground for finding a particular social group on behalf of the child when you're dealing with a disabled child as opposed to the FGM issue here? Because here, this is a traditional practice, and the opposition of the parent has to be part of the definition of the group, which isn't true in the other instance. So it could be you could come to a different answer, couldn't you? Your Honor, I suppose you could come to a different answer, but I see more similarities between this set of circumstances. I think what the court held in Chuck Rova and what the BIA itself has held and what the INS itself has recognized is that harm to a beloved family member can constitute, or persecution of a beloved family member can constitute persecution of the individual themselves. And once you accept that... Well, but in this case, the individual who's threatened can stay here, has an absolute undefeasable right to stay here and avoid the harm, which was not true in the Russian case. So there is an avenue for avoiding the harm to her, and by that same token to her parents. But let's get past this exhaustion issue. Why don't you explain to me why this is persecution? I mean, persecution, as I understand the concept, is you're doing something to somebody to harm them, to persecute them, to cause them a disadvantage. This is a traditional practice, not one that we follow, but it's a traditional practice that families engage in, I gather, in Ethiopia, that they believe is good for the child, is good for the society. It's just how people live. And I'm sort of wondering how that can be classified as persecution. Yes, Your Honor, thank you for that question. I think this court has first looked at the gravity of the harm in considering whether or not a harm rises to the level of persecution. But to decide whether it's harm, we sort of judge by our standards. We say, we don't do that. Well, you know, I don't know, we pierce the ears of little girls. I mean, do that, you know, that's sort of a mutilation of some sort. Everybody thinks it's okay. Other societies may not think so. We circumcise little boys, and some society thinks that's barbaric. But we don't do it to harm them. We do it because we think these are good things to do, and this will make them a better, healthier member of society. How can we take a practice that's – Yes, Your Honor, I would answer that by pointing to two cases, two High Circuit cases. One is the Pitcher-Skya case where this court has held that whether or not there's a benign motive behind a harm, you look at the harm objectively to determine whether or not it's persecution. I'm not persuaded by that case. And since we are in bank, I don't have to follow it. So why don't you explain to me in plain English why a practice that differs culturally from the way we do things but nevertheless is done by that society and by the members of the family for what they think is the good of the child. And parents often make decisions. They make medical decisions. They make all sorts of decisions for children. How that can be classified as persecution? Well, Your Honor, I don't think this court has ever ruled that because something is common in a culture, that insulates it from being considered persecution. We're talking about a practice that has been condemned by the World Health Organization and other organizations universally as being incredibly damaging on a physical and psychological level to the female to whom this is done. And we also have, the Ninth Circuit has looked at human rights norms in determining whether or not a harm rises to the level of persecution. And this court recently, and I understand you're sitting on bank, but this court recently in the Mohammed case said that there was no doubt that the brutal practice of female genital cutting is persecution. The Board of Immigration Appeals has held that. Many circuits have held that. Maybe, but is it persecution? I mean, it's certainly not done with the intent of doing harm to the child. I mean, it may, in fact, do harm, but it is done for a benign purpose. You know, people genuinely believe that given the society they live in and given their belief in their religion and the practice that this is how children are, I mean, I gather that in the same part of the world, males are circumcised when they're teenagers, which I understand is unpleasant, painful, often has complications and so on. I mean, it's different from the way we do things. Your Honor, I think we have to look at, in a way, look at this in two aspects. One is the gravity of the harm. And there is no disagreement that in terms of the gravity of what female genital cutting is, there is no comparison to male circumcision. They simply are not analogous practices. And I don't want to get into a lot of medical terminology, but that is very well understood. And secondly, the Pitcher-Skyatt case, and I know that you're not bound to follow it, and I totally understand that, but the Pitcher-Skyatt case has a wonderful footnote where it says, you know, those who were burning people at the stake during the Inquisition thought they were doing it for their good, too. And yet we wouldn't doubt that that's religious persecution. So I think this concept of thinking that something is good for a person cannot make it outside the bounds of what this Court would consider to be persecution. If I can interject, this is Judge Butcher speaking. I think I'm correct that the BIA has already held that forced female genital mutilation is persecution. Is that not correct? Yes, that is correct, Your Honor. And in order for us to hold that it's not, I think we have to hold that somehow that's an unreasonable construction of the statute. Yes, that's correct. Thank you very much. For me, the harder question is how likely is it that she would in fact be subjected to female genital mutilation or cutting if she were to return to Ethiopia? What's the strongest evidence that you can give us that would push us to the point of saying that the IJ was compelled to find as a factual matter that there was sufficient danger of FGM? Yes, Your Honor, thank you. I would like to address that very briefly. The IJ ruled that there was not a reasonable possibility of a female genital cutting on two bases. First, he ruled that the family would not force the custom. And second, he mistakenly stated that Ms. Abebe, the female petitioner, had testified that she could protect her daughter. There was no basis for the first, the assumption that the family would not force the practice. And there is error regarding the second, that Ms. Abebe had testified that she could protect her daughter. So should we ignore the fact that we're talking about Amharic Christians? Does that make a difference, or that there are some groups within the country that do not practice it, or at least not to the degree that others do? Your Honor, the Amharic Christians do practice female genital cutting, and the Ms. Abebe's family are Amharic Christians. And Mr. Gisu, his biological mother, as well as four of his siblings, and so cousins and other relatives, are Amharic Christians. There's no doubt that the Amharic Christians practice this. What the government raised was the question of whether the – Excuse me. Do they practice it in the urban areas? I understand that there was some difference between the practices in rural areas and practices in Addis Ababa, where this family is from. Yes, Your Honor. Thank you for raising that issue. That is in a State Department profile, Department of State profile for 1994, but that statement is prefaced with the fact that it depends not only on rural-urban, but on ethnicity. And here we have Amharic Christians, where there's no doubt in any of the documentation, the question that was raised was about the Oromos, that they may not practice it. The Oromos being his mother's tribe, the father's biological mother's tribe, is that correct? Mr. Mengistu's, yes, father and stepmother. I'm sorry. His biological mother is Amharic. Exactly. And his biological father and his stepmother are Oromos. And he identifies as being Amharic and has extended families that are Amharic. But there's no evidence in the record, as I understand it, that they would have physically forced them. It's either – it seems to be that she didn't do it, she would be ostracized. Well, Your Honor, I think – Your Honor, I believe that if one looks at the testimony of the parents closely, they refer to the fear that this will, in fact, be forced. They use the language of coercion when they're talking about their fear that the daughter will be subject to this. So on – I believe that it's on administrative record page 137, where Mr. Mengistu uses the word forced, and he says everybody is forced to go through that. And then later on, he talks on administrative record page 138, his fear that they would not be able to stop family members who support that kind of tradition. So I don't think that Mr. Mengistu would have testified in this matter if the possibility of this actually being forced wasn't something that he was aware of. Counsel, do you wish to reserve some time for rebuttal? Because you have about three and a half minutes left. Yes, Your Honor. I appreciate that. I know that I'm a little bit over – let me just say one more thing about the likelihood issue, and then I'll reserve my time, which is that in addition to the testimony, and in addition to the fact that these individuals belong to ethnic groups who practice female genital cutting, we have six pieces of evidence in this record, four of which talk about the incredible prevalence of female genital cutting in this society, two of the reports by actually giving a numeric percentage of saying 90% of the women are subject to this, and the other two reports – Wasn't the 90% figure out of a 1982 report? No, Your Honor. Actually, the 90% rate was out of a 1993 report called FGM in Africa, administrative record page 203. Something more specific to Ethiopia? That was on Ethiopia, Your Honor. And also on the administrative record, page 336, it's a 1993 Department of State country report that also cites the 90% statistic. Thank you. The rest of the record reports also talk about it being nearly universal and that almost all women are subject to it. Thank you very much. We have about two minutes left. Good morning, Your Honors. May it please the Court. My name is Allison Drucker. I'm representing the United States. In this case, we address whether these particular litigants, the parents of a United States citizen daughter, may be eligible on the particular facts of this case for asylum. This Court should affirm the Board regarding the political opinion because the evidence in this case does not compel reversal. On the claim regarding the daughter's possible FGM, the Court should dismiss for failure to exhaust. Failing that, it should affirm the Board's finding that the girl, this particular girl, is not threatened. And if it reaches beyond those two issues to any additional issue, it should remand the Board for the Board to decide in the first instance. A reasonable fact finder would not be compelled to reverse the denial petitioner's political opinion claim, which is based partly on petitioner's activities and partly on a theory of imputed opinion. And, of course, in terms of the standard for substantial evidence, both the Supreme Court and this Court have held that the existence of evidence going the other way is not enough to disturb the agency's finding under that test. We cited in our briefs Arkansas v. Oklahoma and also Singh-Cower quoting American textile manufacturers. In terms of petitioner's activities. But we do review on the record as a whole, right, which means if there are obvious facts that are simply not taken into account, that could be meaningful. That's my understanding of what on the record as a whole means. It's a little different than a usual substantial evidence test, where as long as there's some evidence, that's enough. This isn't exactly that. Am I right? Well, I would argue that still if there's evidence in the record that's going in two directions, that as long as there is evidence supporting the Board's determination, that that would be sufficient. And I think that is the case here. In terms of petitioner's actual activities, he was in an anti-Mangistu group as a teen. He was arrested. And after that point, he was never again politically active while in Ethiopia, even though he was there for nine more years, in 1990. As was discussed earlier, he did not join Medhin until after his asylum application was filed. I think that was filed in July of 93, and he joined Medhin late in 93. He was never a leader in that organization while he was in the United States. There is evidence in the record that at that time current, the TGE, the government of Ethiopia in this record, tolerates members, specifically says members of Medhin who are willing to renounce violence. That's in the 274 and 276. Ginsburg-McGill. What it says is that they would arrest people first, and I mean, at least that's the sense I got. And because they were in Medhin, but if once they were arrested, they could persuade somebody that they were renouncing violence, then they might be released after some period of time. It's not that they wouldn't in the first instance attribute a violent view to members of this group. Well, Judge Burson, I think you're referring to some evidence that has to do with a particular conference that was held there, and this is what happened to, you know, people who are national leaders in different organizations. This person is not at anywhere near that, you know, level of importance in the organization. So I don't think there's any basis to think that he would be arrested in the first place, but if he were arrested, certainly the record would suggest that he would then be released. He also testified specifically that he was willing to renounce violence. That's at page 117 of the record. He also makes claims that pro-Mangistu political views would be imputed to him. This is a rather odd claim because he's already said that he, as a teenager, he was arrested as being anti-Mangistu, so that doesn't seem to really fit together too well. But in any case, his father and his stepmother were apparently active members of Mangistu's party, the WPE, and because of that, they were detained for two weeks and they lost some other kinds of rights. But Petitioner himself was never a member of WPE. He has four siblings and seven half-siblings, all still in Ethiopia, and with one exception, a sister who was training to fight for Mangistu at the time of the overthrow. Apparently none of these other relatives have had difficulty with the regime. His father is still receiving a government pension. That's at page 133 of the administrative record. He also talks about some problems, the imputed political opinion because he got a scholarship during the Mangistu regime. But, in fact, he was able to renew his passport in November of 1991 after the regime changed. That's at page 136 of the record, without apparently having to pay a bribe or, you know, doing anything out of the ordinary. And I think we've already discussed the allegation that there was anything strange about his wife having difficulties getting a visa, that, in fact, that's very understandable, considering the fact that the government of Ethiopia was paying for him to come here and study, hoping to get benefits when he returned. And, in fact, if his wife left to join him, it would become more unlikely that he would return and they would get their investment back, basically. Turning to the topic of FGM. Okay, first the issue of whether this should be dismissed for failure to exhaust. The facts of this case can be distinguished from the recent Thomas decision. In Thomas, this is asterisk four of that decision. I don't have a published version. It says that Thomas raised the issue of there was the family's particular social group in the notice of appeal. Nothing about FGM was in the notice of appeal in this case. Counsel, in this context, why does it make any difference if the agency reached the issue? Well, the agency ---- Well, let's talk more theoretically rather than, it adopted the IJ's opinion, so a lot of you have reached the issue. But let's just talk hypothetically. If an agency reaches an issue, why isn't that fair game for a petition for review, even if neither party has raised it before? Well, I think because if you look at the whole structure of administrative law, the agency is supposed to go first before the court in deciding issues. Congress gave it that responsibility. I agree. But if the agency actually decides the issue, isn't that fair game for a petition for review? I can understand the argument if the agency doesn't reach the issue because the petitioner doesn't raise it in the brief and then raises it for the first time. But if the agency, whether it's sua sponte or otherwise, actually decides the issue, then why isn't that preserved for a petition for review? Even if you take that position here, what would have been exhausted would be extremely narrow. For example ---- I understand that argument, but I guess you did quite answer my question. Why isn't it fair game for ---- let's say that the agency acts totally sua sponte. Neither party has raised any issue. It acts and decides a case on an issue that it was not before it at all. We certainly have the jurisdiction to review that, wouldn't we, even though neither party raised it? I think in the brief we relied on Zara, I think is the name of it, about ---- We're sitting on Bonk and Zara is fair game, I think. But in that case, that is not my hypothetical. My hypothetical is that the agency acts sua sponte, decides the case on a basis that the parties, neither the parties nor the IJ have considered. And according to your position, I think we would have to be jurisdictionally barred from reviewing that because no party had exhausted it. Well, I guess the best answer I can give to that in this particular situation is actually there's really a question as to what exactly the board did adopt and affirm in this case. That's not true. I mean, they said specifically they adopted the entire IJ committee. Did they say that? I don't think in so many words. That's a verbatim affirmance. We adopt and affirm the thorough and well-reasoned decision of the immigration judge in this case. Sounds incomplete. Does that mean they adopt everything, even issues not raised in the petition for review to the agency? I mean, I think this is the same. The claims are raised here, and we affirm based on their well-reasoned decision. I think it's ambiguous. I guess that's my best answer. Are you conceding that when the agency decides the issue, if it decides the issue, that that's fair game for petition for review, and you're quarreling in this case as to whether the agency actually reached the issue? Is that your position? I'm not sure if I completely want to concede the first point, but certainly on the second, I agree with that. Well, the question is what the issue is. I'm sorry. Assuming that the BIA affirmed the IJ's decision, what did it affirm? Right. Right. Well, if you assume that it did. At the most, okay, as I say, I think it's somewhat ambiguous. But at the most, I think it affirmed the idea that the petitioner's daughter is not threatened by FGM. And I think that's very significant here because a lot of the claims that petitioners now raising don't have to do with the daughter being actually subjected to FGM, but rather what will happen if she's not subjected to FGM, meaning then the parents would be ostracized. Those claims certainly were not exhausted because there was no reference to that whatsoever. Now, turning to this issue about that there was no threat shown, that the IJ and the that the court adopted and affirmed that finding of no well-founded fear on that basis, and substantial evidence supports that. I direct you to the mother's testimony on page 164 of the record that she's asked if she's not willing to let this happen, then what will occur? And she says, I will be rejected. The immigration judge took that reasonably to mean that she, in fact, could protect her daughter, although at a price. And this was a reasonable interpretation, particularly because the immigration judge's decision alluded to evidence that was in the record that said, quote, Well, why couldn't she be saying that if she wasn't willing to do it, she would be ostracized and the daughter? That doesn't really address the question of what would happen to the daughter. In other words, her position against the FGM procedure would make her ostracized, but it doesn't address the question of what would happen to the daughter. Well, first of all, the burden of proof is on the petitioner. But secondly, What would happen to the daughter, isn't there? Well, as I was about to say, there's also the immigration judge's decision alludes to evidence in the record that says, quote, Reportedly, women are able to prevent their daughters from being subjected to FGM by relatives. So the immigration judge relied on that. That's mentioned at 53 in the record in his decision and refers to 273 in the record. Now, the subject has already come up about the record also saying specifically the immigration judge alluded to this, too, in his decision at 53, that in urban areas, women under 25 are not likely to be subjected to FGM. That's citing 273. Now, the record also says that Christian Oromos do not practice FGM, the same part of the record. The father here and his family. What about Amharic Christians? I think Amharic Christians, but it says that they do practice that. Okay. And how prevalent is the practice among Amharic Christians? Well, I don't think there's any statistics about that specifically in this record. Okay. And a question I previously asked counsel, do you have a response on that as to whether there is a statistical difference that can be documented between rural Ethiopians and urban Ethiopians? Well, it says in urban areas, women under 25 are not likely to have been subjected to this practice. Now, I mean, this is coming from a report. I don't recall the exact date, but it's, you know, roughly 10 years ago, right? Okay. Roughly 10 years ago. But we don't have any way of cross-referencing two sets of statistics, one that says that Amharic Christians are likely to practice this and another one says that urban Ethiopians are not as likely to practice that. And now we don't know what happens to urban Amharic Christians. Is that right? I guess that's true. But the statistical concept, but if this is, you know, speaking about urban areas in general, any group in an urban area would be covered by this statement in the record, and this is something that the IJ was, you know, could respond on in coming to his decision. Pardon me for interrupting. This is Judge Fletcher speaking. The material that we've been talking about for the last minute or two is sort of general discussion of what happens to this group, what happens to that group, certain kind of Christian, rural, urban, and so on, without any particular reference to these people. And we have testimony from the father that he fears that if he is, for example, in prison or otherwise disabled, it will happen. What do we do with the evidence that is specific as to this family and to this child? Well, the father says that if something happens to him, he's worried because, you know, he thinks that the mother will give in or whatever. So I think we need to look at what the mother says, and I've already ---- Excuse me. He doesn't say the mother will give in. He says the mother will not be able to stop it from happening. Okay. That's different. All right. I accept your ---- that's a fair characterization. Thank you. Okay. But my point is it throws it back on what, you know, the mother, and the mother has testified in her own right, and I've already mentioned what she said and why ---- But the only thing she said is that if she is unwilling, she will be ostracized. She doesn't say I can or cannot, I will or I won't. The word willing is introduced in the question. If you are unwilling, what will happen? Well, what will happen is I will be ostracized, she says. She herself doesn't say I'm willing or unwilling. That's the other word. That's the questioner's word. There's certainly other evidence that she's, you know, she doesn't like FGM. She doesn't ---- she's not happy with the fact that it happened to her,  and those statements connected with this statement and connected to these other aspects of the record, we believe are enough to say that the record does not compel reversal of the immigration judge and the board on this point. If I can ask this question, and this is a more abstract question than what we've been doing for a moment, assuming that we can determine with some degree of certainty, as you're arguing we cannot from this testimony, that there is some chance that it will happen, how high is that chance required to be? 20% chance enough, 30% chance enough, 15%? What's the percentage chance that's required for there then to be ---- to get over the hurdle? We certainly don't require certainty. Right. Well, I think that ---- If you're uncomfortable with percentages, how likely is it necessary that it be? Well, I think on this record, given the totality of it and including the statement that ---- about the urban areas as well as her background, I think that regardless of what that statistic is, that there is substantial evidence. But you're not really answering my question except to give me the conclusory statement that says, well, this is not likely enough. But I kind of want to know what's the standard against which I'm supposed to judge how likely is sufficient? I'm sorry, Your Honor, I don't seem to recall that. Does the Supreme Court answer the question, is anything over 10% or something? There is a 10% number floating around in the case law. We start with 10%. We start with the ---- in the same section you've been citing, it starts with the phrase, most Ethiopian females have undergone some form of genital mutilation, although the practice depends on the factors you've described. And we know that she fits into a factor that doesn't neatly fit into those categories. Isn't it reasonably likely that she has at least a 10% chance of getting mutilated if she goes back? I disagree with that. I'm looking at the paragraph that you're referring to, I believe, on 273. Yeah, I'm looking at the first sentence. I'm starting with the first sentence. And it says ---- Okay. All right. After that, it says, for example, women from Gajam and Christian Oromos are not mutilated. Okay. Again, we have, I mean, the male line in this family are Christian Oromos. They're not doing this at all. Yes. Yeah, but if you take her other ethnicity, which is not discussed in there,  if she's subject to discrimination based on her other ethnicity, that she is going to suffer FGM. But it also has this, you know, covering sentence about, not about specific ethnicities, but about urban women in general, that most urban women under the age of 25 are unlikely to be mutilated. Reportedly, women are able to prevent their daughters from being subjected to circumcision by relatives. All that taken together, I think, is enough. Let me ask a question. If we've identified the standard not as being more likely than not, but something as low as 10 percent, how does this sentence or whatever you've read speak to that standard? I think that it satisfies that standard, Your Honor. Is most the same as 90 percent? Well, it's just different factors combined. So, I mean, they're not all numeric. They're not expressed as numeric elements. To me, the most interesting piece of evidence here is the exhibit on page 203 about percentage. Because the one thing you can see there is that the percentage of Ethiopian Eritrean is especially high. And in the other cases that I can see, the BIA case was something like 20 to 30 percent, and then in the second circuit case it was like 50 percent. And here we're dealing with a country in which the government report, as I understand it, from 1992, was 90 percent. So if you then back down certain ethnic groups, you're dealing with an incredibly high percentage of people who are – of women who are likely to have this done to them. And then even if you say that some percentage of urban people are not likely to have them done to them, it's still – unless there's absolutely nobody in Addis Ababa having this done to them, it's – Well, I think that's quite likely, given the fact that – I mean, this statement was made 10 years ago. And it's talking about girls and young women who were 25 – you know, born 25 years previous. So 35 years have gone by. We're on this record. Yeah. Are you introducing a new record? You're trying to do – introducing new evidence on – No. I'm just – I'm just stating what, you know, what's there. Right. So it was a passage of time, that's all. I think, however, I think the Court really, you know, understands the parameters of this issue. And I'm wondering, since I see the clock running, if it might be more helpful to the Court if I attempt to move on to the question about the venture or remand, if that's acceptable. Petitioners have raised a number of arguments why, as parents, they should get asylum. None of these have been decided by the Board. The Court need not reach these, but if it plans to, it should remand under Ventura. Petitioner made some arguments in their brief about three categories and trying to cabin Ventura to three categories. There doesn't seem to be any basis for any such cabining in the actual language of Ventura, which seems to be quite general. So I guess our point is these various issues that they've raised that would cause the parents to get asylum all have not been reviewed by the Board. In fact, they weren't decided by the immigration judge. They weren't raised to the Board as well. And in each of these cases, if they did go back to the Board, we can say that a reasonable fact finder could reject each of the arguments raised by petitioners. Now, petitioners argue that several of these issues are controlled by Chukrova. The Board really didn't get a chance to address these issues in Chukrova itself. And if Chukrova prevents the Board from addressing them here, this Court should overrule Chukrova so that the Board does get an opportunity. What are the issues as you see them? Okay. Well, the main issue, I think, the thing that we think is the most appropriate for remand would be this concept that a parent can get asylum based on the parent's persecution. But they have also raised, I think, some others, the idea that parents and parents who are the parents' persecution or the child's persecution. I'm sorry. I beg your pardon. You said the parent can get asylum based on the parent's persecution? No, no. You mean the child. If I said that, I misspoke. I apologize, Your Honor. You mean the child. Yes. Well, as I understand the concept, it isn't that they're getting asylum based on the child's persecution. It's that their persecution consists of their emotional harm due to their child's injury. At some, I mean, just at a hypothetical level, do you think that that can exist? Let's suppose what happens is the parent is made to stand and watch their child be killed. Okay. Well, again, again, I can't reiterate too much. I can't speak for the Board. I don't think the Court should be speaking for the Board. I mean, this is something the Board should be deciding in the first instance. But as I said, I think certainly a reasonable fact finder could reject the point of view, at least as applied in this case. I see you didn't raise that issue. Well, okay. Did you raise that issue before the Board? I'm sorry? Did you raise this issue before the Board? What issue? The derivative issue. I don't think this was raised before the Board because the Board even had notice, you know, that any FGM issue was coming up whatsoever. So, I mean, we would say that's why it should be remanded, so that they should have an opportunity. I'm just assuming, I mean, well, I've been assuming, I mean, Judge Berzin is asking me some questions, which I'm hoping to try to respond to. Well, we have biblical precedent for inflicting suffering on people by taking children. So are there any other issues that should be remanded? I'm sorry. I'm not quite following the thrust of your remarks, Judge Schroeder. Are there any other issues other than the issue of the persecution of the child being able to be considered persecution of the parent that you'd like to remand for consideration? Well, if the Court reaches any of these, the idea of what constitutes ostracism, that's certainly something that the Board should determine. All that was said in this case, I mean, the term was used. I'm referring to ostracism of the parents. There was some material in the record about what ostracism of the girl might consist of. But in terms of ostracism of the parents, that really wasn't fleshed out at all. The idea that the parents and the children can be combined here as a joint social group, which is something that was thrown out in the Cukrova decision, for the sense that presents the same kinds of theoretical problems as the asylum statute. I understand the persecution has to be that of the individual seeking asylum. Right. But does the basis for it have to pertain to the person? The statute doesn't seem to say that. Looking at the two statutes, the withholding statute does specifically say that the unaccounted has to be the individual, but the asylum statute doesn't say that. The um, I think if you read closely, 8 U.S.C. 1101, 842, the definition of refugee. I did read it closely. I didn't see any reference to it. I believe it addresses that. Also, there's language in Elias Zacharias at 842 where it talks about persecution on account of the victim's political opinion. I just think generally asylum law talks about the applicant being the one targeted. And what's so significant about the derivative provision that we talked about in the brief is that there Congress created a very narrowly crafted exception to this concept that the applicant is the one targeted. Also, the authorities that are cited in Petitioner's brief, note 31 and 49, and also 27 of the reply, I think are questionable. Some of them are not on point, and some of them rely totally on non-authoritative sources such as unpublished decisions of the IJ and BIA. You have used your time. Thank you. Thank you. I'm just going to address a couple of points very quickly. One is that a lot of the focus on attempting to say that the evidence doesn't compel the conclusion that there's a reasonable possibility of genital cutting is focused on this And I'd like to point out that there may be some question about the accuracy of this report, because it reports that among the Christian Amharas, the form of female genital cutting is symbolic clitoral nipping, which is a very, one of the less invasive forms. But yet Ms. Abebe, the female petitioner who underwent female genital cutting herself, whose parents forced her to undergo it, she submitted a doctor's certification that she had the total removal of her clitoris, a clitoridectomy. So I would just bring that to the attention, if we're depending just on one piece of evidence in this record and parsing what it says, the fact that it bears that inaccuracy should make us pause, given the rest of the evidence in the record about the prevalence of female genital cutting. So that would be one quick point. And then to just say that when we're looking about whether or not the young girl is likely to undergo this, we have to look at the totality of the circumstances. This is the same thing with the political opinion part of the claim. But we have to look at the fact that it's prevalent, that they belong to ethnicities where it's practiced, that Ms. Abebe herself underwent it, that the young girl is at the age where from eight to puberty, when it's most likely for the most extreme form of female genital cutting to take place. Those are all factors that, taken with the credible testimony and the evidence in this case, compel the conclusion that there's at least a reasonable possibility that this young girl will undergo this brutal harm. The rest of the issues that were raised at the tail end of your opponent's closing, the ostracism issue, the social group issue, would you agree that the board has never been given the opportunity to assign on those issues? Your Honor, I would say that if the court were to ñ that the court did not ñ let's say the ostracism issue, I believe, would require a remand to the board. But I think that if this court were to find that the evidence compels that female genital cutting is a reasonable possibility, then that is a case, that is a set of circumstances where the court could go on and decide the rest of the issues because there's no more fact-finding. Including the social group issue, that the family unit as a whole must be recognized if we assume that the daughter has a reasonable fear of future persecution without any input at all from the administrative agency?  Okay. Your Honor, I believe that there's controlling precedent in the Ninth Circuit and extensive jurisprudence on particular social group, and particularly with the parent-child type scenario, and so that it would be a matter of the Ninth Circuit applying its precedent. And under those circumstances, the court generally doesn't remand if what it's going to do is correct the facts and simply apply its precedent to those facts. Thank you very much. Thank you. The case just argued is submitted for decision, and this session stands adjourned.
judges: Schroeder, Kozinski, Rymer, Thomas, W. Fletcher, Paez, Berzon, Tallman, Clifton, Bybee, Callahan